UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BORIS POGIL

Plaintiff.

— against —

KPMG, LLP
ANDREW J. ZIEGLER
SCOTT M. MASAITIS
TONYA CHRISTIANSON
DAVID LIN
LENA HAIDYSH
LARA CZERWINSKI

Defendants.

Civil Action No.  21-7628

**<u>COMPLAINT</u>**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

The Plaintiff, BORIS POGIL, (hereinafter "Plaintiff") by his attorney, Garry Pogil,

complaining of the Defendants, KPMG, LLP (hereinafter "KPMG"), ANDREW J. ZIEGLER

(hereinafter "Ziegler"), SCOTT M. MASAITIS (hereinafter "Masaitis"), TONYA

CHRISTIANSON (hereinafter "Christianson"), DAVID LIN (hereinafter "Lin"), LENA

HAIDYSH (hereinafter "Haidysh") and LARA CZERWINSKI (hereinafter "Czerwinski"),

alleges as follows:

<u>NATURE OF THE CASE</u>

The allegations in this Complaint are predicated on *Title VII of the Civil Rights Act of
1964 (42 U.S.C. §§2000e to 2000e-17)*; and violations of the *Fair Labor Standards Act
("FLSA"), 29 U.S.C. §207;* and *New York Labor Law.*

<u>JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS</u>

Jurisdiction is proper pursuant to 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §1331 and 1343.  Additionally, the Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

Venue is proper in this district pursuant to 28 U.S.C. §1390.

Plaintiff received a "Notice Of Right To Sue" letter on June 16, 2021 and files this action within the required 90 days.

<u>STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION</u>

1. Plaintiff began his employment with KPMG in April of 2018 as a Senior Associate in Mergers and Acquisitions Tax group.

2. Prior to joining KPMG, Plaintiff never received a performance review or evaluation that commented adversely on his performance.

3. After joining KPMG, Plaintiff never received a performance review or evaluation that commented adversely on his performance.

4. After joining KPMG, Plaintiff was never put on any Performance Improvement Plan or any equivalent of such.

5.  On or about March 26, 2020, Plaintiff advised Ziegler (Plaintiff's Supervisor and Performance Management Leader, "PML") that due to the coronavirus-related health crisis, Plaintiff's child-care responsibilities would be such that it would be difficult to maintain the usual workload.

6. Upon information and belief, the sources of such information include Lydia N. Bull, Senior Manager at KPMG (hereinafter "Ms. Bull"), former KPMG employees, and review of documents, shortly thereafter, in March of 2020, the Defendants entered into a conspiracy to

issue false performance evaluations to targeted KPMG employees, including the Plaintiff. Such was done with the knowledge and consent of Masaitis, who was the head of KPMG's East Region Mergers & Acquisitions tax practice during all relevant times to this complaint.

7. (i) When Ms. Bull was asked why a certain Senior Associate was terminated, she stated: "Some people only work with people to give them bad GPSs."[1] According to the same source, such occurred primarily in the Mergers & Acquisitions Tax practice where Plaintiff worked.  Furthermore, according to Ms. Bull, Fiona Donovan (Tax Managing Director of KPMG) had targeted —by issuing unsubstantiated performance-related statements —another KPMG Senior Associate whose employment was subsequently terminated.

(ii) One KPMG employee was warned that such targeting was happening and stated to Ms. Bull: "you also warned me when that was happening and I owe you for that."  Such KPMG employee was the same level as Plaintiff, and he was not terminated on 10/16/2020.

(iii) Upon information and belief, all of the above was done with the knowledge and approval of Masaitis and Human Resources Manager, Haidysh.

8. Ziegler became Plaintiff's PML on or about September of 2019.

9. Ziegler, or any KPMG employee(s), never met, and Ziegler, or any KPMG employee(s), never requested to meet, with Plaintiff concerning any work performance-related issues.

10. It is the duty of every PML to promptly raise all performance-related issues with the employee to whom he or she is assigned.

---

[1] A "GPS" is a Performance Evaluation issued by a supervisor.

11. (i) On May 26, 2020, Ziegler, at the direction of Masaitis, Haidysh and Czerwinski, authored a Low Performance Evaluation as to Plaintiff, which had as its purpose and effect to label Plaintiff as a low performer and to destroy Plaintiff's professional reputation.

(ii) On or about May 1, 2020, Ziegler told Plaintiff that the direction to issue a Low Performance Evaluation came from KPMG's Human Resources department.

(iii) According to Haidysh, initiating a Low Performance Evaluation never originates at the Human Resources department.

12. When Plaintiff asked Ziegler what qualifies as a low performer, Ziegler said: "I don't know if there's a specific…"

13. According to Czerwinski, a low performer is a "myriad of factors" and not just low utilization: "There's gotta be more substance than that."

14. Ziegler has never requested to meet with the Plaintiff about any of the issues raised in the Low Performance Evaluation of the Plaintiff that Ziegler himself has written and disclosed to third parties.

15. (i) Ziegler and Czerwinski failed to disclose to the Plaintiff the contents of the Low Performance Evaluation of the Plaintiff until Plaintiff asked for a copy of such during the telephone conference between Ziegler and Czerwinski.

(ii) Ziegler and Czerwinski did not have a good faith explanation for failing to disclose to Plaintiff the contents of the Low Performance Evaluation, and such failure was intended to blindside Plaintiff — to not give Plaintiff an opportunity to respond to the contents of such evaluation.

(iii) The failure to disclose to Plaintiff the contents of the Low Performance Evaluation was done with the knowledge and consent of Czerwinski's direct Manager, Haidysh.

16. Ziegler's failure to disclose to the Plaintiff the contents of the Low Performance Evaluation of the Plaintiff constituted a violation of Ziegler's duties as the PML and supervisor.

17. Ziegler has put Plaintiff on multiple engagements where, even though Plaintiff was hired as a Senior Associate, Plaintiff was acting in the capacity of a Manager (without being compensated as a Manager), and Ziegler has never brought up to the Plaintiff's attention any performance-related issues raised in the Low Performance Evaluation. When Plaintiff's former PML left the firm, he designated Plaintiff as the M&A Tax Manager on the Firmenich SA account.

18. Since the year 2019, Plaintiff had multiple evaluation reviews that supported Plaintiff for Management and extolled Plaintiff for "Demonstrating at Next Level."

19. In Plaintiff's performance evaluations, the statement "Demonstrating at Next Level" meant that the "Next Level" is Management.

20. (i) On May 5, 2020 — three weeks before the Low Performance Evaluation was published concerning Plaintiff — Andrew Lindsay — a Managing Director of KPMG's Deal Advisory & Strategy practice wrote to Ziegler and Masaitis stating the following as to Plaintiff: "Boris did a great job teaming across service lines and interacting with the main client sponsor to position KPMG for the RFP. I was very impressed with his abilities and felt they were definitely consistent and what we look for in manager level team members."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii) This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations and was never disclosed at any time thereafter.

21. Such duties (as described in ¶20) performed by the Plaintiff are typically reserved for management-level and above at KPMG.

22. (i) On April 12, 2020, a Manager at KPMG's M&A Tax practice, Joanna Demko, wrote: "Boris managed the associate on the team well, and kept the deal moving at the appropriate pace. He also managed four member firms throughout the process and ensured the client's questions were adequately addressed." Furthermore, such evaluation stated that Plaintiff was demonstrating at "Next Level" in all relevant categories.

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii)  This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations.

23. Such "member firms" consisted of associates through partner-level members.

24. (i) On April 13, 2020, a Tax Managing Director at KPMG, Christianson, stated: "Boris does a nice job of leveraging work to staff. When work is leveraged, the manager retains responsibility for checking the work product and understanding the conclusion regardless of leverage. Boris had a good command of the facts, issues, and conclusions when he leveraged."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii)  This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations.

25.  (i) A Senior Manager in KPMG's M&A Tax practice (Jamila Beckford) wrote on March 21, 2019: "Boris is eager to grow and progress to the next level. Boris takes on more of a leadership role on his engagements and is ready to start leading calls. I fully support Boris being promoted to manager this year."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii) This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations.

26.  (i) A Senior Manager of KPMG's Tax Mergers & Acquisitions, Justin Hamor, wrote on March 18, 2019: "Boris has strong business management skills. Boris understands our KPMG's business and our client's needs. I think these qualities will make Boris a strong candidate for manager."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii)    This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations.

27. (i) On May 26, 2020 — the same day that the Low Performance Evaluation was circulated and published concerning Plaintiff — Plaintiff received a performance review on the Bank of America engagement, from Joseph B. Lancaster, noting the following: "Boris structured his work effectively to meet deadlines with quality deliverables."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii) This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations and was never disclosed at any time thereafter.

28. (i) In July of 2020, Plaintiff was also noted to be Demonstrating at the "Next Level" by Doug Henry (Tax Managing Director with KPMG), who noted: "Exhibits strong technical and analytical abilities as well as fact gathering, critical thinking and research skills."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

(iii). This evaluation was intentionally omitted by Ziegler and Masaitis when Plaintiff was presented at the mid-year evaluations and was never disclosed at any time thereafter.

29. (i) The above-mentioned evaluations were excluded from Plaintiff's HR/Personnel file by both Haidysh and Czerwinski.

(ii) The callousness of such omissions had as its goal to ensure that any future employer of Plaintiff, if they requested Plaintiff's HR file, would not be able to see Plaintiff's positive evaluations supporting him for Manager.

30. The above-mentioned evaluations were intentionally excluded by KPMG employees and/or agents from Plaintiff's HR/Personnel file.

31. The above-mentioned evaluations were destroyed by KPMG employees and/or agents.

32. KPMG has a policy that allows "departing KPMG professionals the ability to upload and retrieve their personal information." The Performance Evaluations/Reviews are explicitly included as such personal information.

33. Plaintiff was prevented from retrieving his Performance Evaluations/Reviews when his employment was terminated. Such prevention was in violation of KPMG's above-mentioned policy and was done with the knowledge and direction of Haidysh and Masaitis.

34. (i) When Ziegler was asked by Plaintiff, on or about May 1, 2020, the prospects for being promoted to Manager in light of the above-cited reviews, which stated that Plaintiff was Demonstrating at the "Next Level" and documented support for management, Ziegler stated to Plaintiff that he was asked by KPMG's Human Resource department to put together a Low Performance Evaluation as to the Plaintiff, and, as a result of such, the odds for a promotion would be slim.

(ii) On April 13, 2020, Ziegler approved Plaintiff's action plan for the year 2020 goals, which included Plaintiff's promotion to Manager in the year 2020 and managed-revenue goals, however, such managed-revenue goals were not required at the Senior Associate level.

35. When Plaintiff asked Ziegler, on or about May 1, 2020, if there was any good feedback at all from the mid-year assessment of the Plaintiff held at the end of April of 2020, Ziegler did not respond directly and stated that the conversation got "derailed" after the utilization numbers were discussed.

36. Ziegler and Masaitis falsely stated to third parties that Plaintiff was one of the lowest-utilized Senior Associates in the Country.

37. Since, as Ziegler put it, the conversation got derailed after low utilization accusations, as per Human Resources, this should not have caused a labeling of a Plaintiff as a low performer

9

because as noted above, according to KPMG's Human Resources, "low performance" is comprised out of a "myriad of factors" and "there's gotta be more substance than that."

38. KPMG has an annual goal with respect to utilization, beginning in October of every fiscal year; however, as per Ziegler's own admission, Plaintiff was held to a different standard and was told by Ziegler that Plaintiff was judged up to the mid-assessment period, when Ziegler knew that while Plaintiff was working on a lot of mergers & acquisitions deals, such deals did not move forward, without the fault of the Plaintiff.

39. Even if Ziegler applied the less-than-the-annual utilization standard of evaluating utilization up to the mid-assessment period, he stopped counting after the end of February and failed to take into account March and April.

40.  Masaitis acknowledged, in a conversation with Plaintiff, that Plaintiff should have been evaluated on an annual basis "twelve-month rolling utilization."

41. Failure of deals or engagements to move forward is a common occurrence in a merger & acquisitions practice.  Masaitis, in a conversation with Plaintiff, acknowledged that stalled deals and the economy were the reasons for lower-than-usual utilization for parts of the year.

42. The protocol at KPMG is when deals are stalled, employees are expected to reach out to seek out other engagements in the M&A Tax group.

43.  Plaintiff followed this protocol exactly and sent out approximately 40 to 60 requests and within a few weeks of such, Plaintiff was placed on M&A Tax engagements.  Additionally, Plaintiff updated his RETAIN on a weekly basis and reflected his availability to the entire group.

44. In the October to January period, there were KPMG Senior Associates whose utilization was in the 30s, yet such individuals were not given a Low-Performance Evaluation.

45. On May 1, 2020, in a conversation with Plaintiff, and at the mid-year assessments in April of 2020 where Ziegler presented Plaintiff's performance, Ziegler falsely stated that Plaintiff's utilization was around 29% and that such was one of the lowest in the country among Senior Associates.

46. Ziegler, at the direction of Masaitis, failed to take into account and convey Plaintiff's managed revenue credit where Plaintiff worked in the capacity as a Manager on eight (8) engagements at the same time when Plaintiff was working in the role he was hired to do, namely that of a Senior Associate, not Manager.

47. Even though Plaintiff was hired as a Senior Associate, he was a Manager/acting Manager on the following eight (8) deals during the utilization assessment: Projects "Ship", "Hercules", "Paper", "Label", "Groundworks", "Teasdale", "Luke", "Arrowhead".

48. By Ziegler's own admission, not a single negative comment was brought up during the mid-year evaluations and the conversation got derailed after the utilization was discussed.

49. Individuals who are Managers/acting Managers, typically charge less time than those who solely work in the Senior Associate capacity, which is why utilization for Managers tends to be lower as compared to associates.

50. Ziegler, at the direction of Masaitis, withheld during the mid-year evaluations the fact that Plaintiff was not a typical Senior Associate in that he also managed eight (8) deals and therefore his utilization would be lower as Managers typically charge less time.

51. Even if Plaintiff's utilization was to be calculated on May 7, 2020 (for a period less than the fiscal annual goal set by KPMG), Plaintiff's utilization was around 55% to ~90% in February, ~81% March, ~90 in April, and ~133% in May of 2020. Additionally, Defendants failed to include Plaintiff's approximately 77.5 hours of business development, and if such

11

would have been included, Plaintiff's utilization on May 7th of 2020 would have been in the 50s and approximately 55% at the end of May of 2020.

52. Instead, Plaintiff's utilization count was inexplicably stopped prematurely, which not only violated KPMG's annual fiscal year goal policy, but it violated their arbitrary selection of only reviewing utilization at mid-year reviews in the third week of April as Plaintiff's utilization for March and April were not taken into account.

53. Ziegler intentionally counted Plaintiff's utilization only from October of 2019 to end of February of 2020.

54. Masaitis approved counting Plaintiff's utilization only from October of 2019 to end of February of 2020.

55. Ziegler intentionally omitted including Plaintiff's approximate 80 hours of business development in the utilization metric.

56. Masaitis approved omitting Plaintiff's approximate 80 hours of business development in the utilization metric.

57. In October of 2019, Masaitis directed Plaintiff not to reach out and work with Jamila Beckford.  Plaintiff did not understand why Masaitis would make such a direction without explaining any reasons for such. In fact, Masaitis told Plaintiff, in a separate conversation, that some people make his "blood curl" because he could not believe that he was paying them a paycheck.

58. The above-mentioned performance evaluation from Andrew Lindsay, who stated in sum and substance that Plaintiff's performance was consistent with Management level, was sent to both Ziegler and Masaitis; however, such positive review, along with many others, were withheld from the mid-year evaluations of Plaintiff.

59. In or around February of 2020, Plaintiff was selected to be a Manager on a full scope tax due-diligence engagement, entitled "Project Luke."

60. With respect to "Project Luke", Plaintiff managed the entire deal and completed the full-scope tax due-diligence report, which was submitted to Jason McCaughey — a partner at KPMG's M&A Tax practice.

61. (i) Mr. McCaughey praised Plaintiff and did not make a single negative comment with respect to Plaintiff's performance.  In fact, on March 12, 2020, Mr. McCaughey wrote to Plaintiff: "Ok, I'm good with the report.  Good work."

(ii) This evaluation was intentionally omitted by Haidysh from Plaintiff's Human Resources/Personnel file, and such review was not included in Haidysh's justification memorandum for the Low Performance Evaluation, which Masaitis approved.

62. Ziegler falsely claimed that when he spoke to Mr. McCaughey, Mr. Caughey's feedback was "mixed" and that he said Plaintiff was a "strong Senior at best."

63. Mr. McCaughey never said what Ziegler stated as described in paragraph 62 above.

64. Even if Mr.Caughey said what Ziegler stated, that Plaintiff was a "strong Senior at best", being a strong Senior does not merit a Low Performance Evaluation when an individual excels in the position for which he was actually hired, a Senior Associate.

65. Additionally, Defendants intentionally manipulated Plaintiff's utilization for the month of October of 2020 by having the utilization as a negative sixteen, which had the effect of bringing down Plaintiff's utilization. When Plaintiff brought this to the attention of KPMG, they failed to correct such.

66. On May 26, 2020, Ziegler admitted the following on the call with Plaintiff and Human Resources: "Maybe your work is better than we are giving you credit for and time management issues I think are there aren't really there."

67. (i) On May 26, 2020, Ziegler told Plaintiff that their primary goal is to have Plaintiff succeed very well in the group, and that they will continue to monitor Plaintiff's performance, and "we'll set you up to succeed."  Czerwinski added that the goal is to see "how we're going to assimilate you back into the group."

(ii) Czerwinski did not explain what she meant by "assimilate you back into the group" as Plaintiff was hired and worked in the M&A Tax practice.

68. (i) Ziegler and Czerwinski had no intention to have Plaintiff assimilated or have him succeed as Czerwinski, on May 26, 2020, offered a career-transition package, because a determination had already been made to terminate Plaintiff's employment. Czerwinski then, as part of the same conversation, pressured Plaintiff to give a yes or no answer on the spot.

(ii) According to Haidysh, the reason why Czerwinski did not conduct the investigation when Plaintiff filed the ethics and compliance complaint is because Czerwinski may have a "bias" because she and Ziegler worked together in the past.

(iii) In light of this potential bias, KPMG failed to appoint a different Human Resource employee to be involved and lead the call about the Low Performance Evaluation.

69. On May 26, 2020, Czerwinski failed to advise Plaintiff that there existed a process to challenge a Low Performance Evaluation.  It was not until Plaintiff asked if such was an option did Czerwinski explain the process and stated: "you don't have to call the ethics and compliance hotline or anything like that."

14

70. On May 26, 2020, Czerwinski could not explain to the Plaintiff why he was labeled a low performer and only stated that "there was some stuff that was lacking."

71. On May 26, 2020, Ziegler admitted that none of Plaintiff's reviews that supported Plaintiff for Manager made their way to the mid-year evaluations when Ziegler presented Plaintiff's performance.  Irrespective of such, Czerwinski stated that Ziegler "has done his due diligence." Czerwinski knew that this was a false statement, however, due to her prior relationship with Ziegler, she felt necessary to protect him.

72. On May 26, 2020, Ziegler made an oral promise that the Low Performance Evaluation would be torn up if Plaintiff would receive a positive review from the Bank of America engagement. Plaintiff relied on this promise and continued to do the work that is reflected in the above evaluations, working days, nights, and overtime hours for which he was never compensated; however, Ziegler had no intention of keeping this promise as the Plaintiff's employment was officially terminated within days after KPMG reached a final determination on Plaintiff's ethics and compliance complaint and Plaintiff's rebuttal to the Low Performance Evaluation.

73. In a conversation with Masaitis, Masaitis made the same promise to Plaintiff as described above in ¶72 and said, as to Bank of America engagement, "You've definitely done the right thing via KPMG." However, irrespective of Plaintiff's positive evaluations on the Bank of America engagement, Plaintiff's employment was officially terminated within days after KPMG reached a final determination on Plaintiff's ethics and compliance complaint and Plaintiff's rebuttal to the Low Performance Evaluation.

74. One of the duties of Ziegler as Plaintiff's supervisor and PML was to issue performance reviews based on the deals he worked with Plaintiff.

75. Ziegler failed to issue such evaluations irrespective of Plaintiff requesting such on multiple occasions, and irrespective of the fact that Ziegler, on February 12, 2020, stated: "Yes, will take care of it this week." Such failure was a violation of KPMG policy.

76. When Plaintiff asked Masaitis as to why Plaintiff was branded a low performer, Masaitis could not provide a single specific reason as to Plaintiff's performance: "There's something that hasn't clicked, and I honestly don't know what it is." "I can't figure out where the disconnect is." "There's a disconnect somewhere." "I really don't know what it is." "Maybe it's just bad luck." "It's not work ethic, you're working your ass off all night long."

77. When Masaitis was again asked to define a low performer, he said: "You don't have people banging at the table for a promotion." "Where is the gap?" Masaitis did not explain to Plaintiff why not being promoted to Manager would cause somebody to be labeled a low performer, when (even though Plaintiff was performing work as a Manager), Plaintiff was hired in the capacity of a Senior Associate.

78. Upon information and belief, the source of such information being Plaintiff's new Performance Manager Leader, Scott L. Novick, Mr. Novick issued Plaintiff a mid-year assessment based solely on Ziegler's Low Performance Evaluation. According to Mr. Novick, he did not review any of the Plaintiff's positive performance evaluations that supported Plaintiff for Manager and for each category stated that Plaintiff operated at the "Next Level."

79. At the bottom of the mid-year assessment as to the Plaintiff referenced in ¶78 above, Mr. Novick checked the box that reads: "Interim Discussion Held with Counselee." Such was a false assertion as Mr. Novick knew that he has never had any discussion with Plaintiff with respect to Plaintiff's mid-year assessment before writing the aforementioned mid-year assessment.

80. According to KPMG's Human Resources department, Mr. Novick was supposed to conduct his own independent assessment and not rely solely on Ziegler's Low Performance Evaluation.  However, Mr. Novick disregarded his duties in furtherance of the Defendants' conspiracy to defame Plaintiff and find reason to terminate his employment.  Such was done at the direction of Masaitis and Haidysh.

81. Mr. Novick told Plaintiff that challenging the Low Performance Evaluation would be time wasted and urged Plaintiff to continue working with Ziegler.

82. Mr. Novick told Plaintiff that any review he received from work not related to Mergers & Acquisitions or reviews made by out-of-state supervisors would be discounted.

83. Mr. Novick did not explain why such reviews would be "discounted."  Plaintiff was given evaluation criteria that was not applicable to any other KPMG employee.  When Plaintiff asked Novick to provide any KPMG policy that related to the evaluation criteria imposed upon Plaintiff —Novick failed to provide such.

84. Plaintiff was falsely accused by Ziegler for turning down work not related to Mergers & Acquisitions.

85.  Mr. Novick told Plaintiff that what Plaintiff needed to do is prove that Plaintiff can act as a Manager, that Plaintiff is not a low performer.

86. Plaintiff had already been an acting Manager on several deals and received praise for his work in such capacity as delineated above.

87. Mr. Novick did not explain why Plaintiff needed to prove that he can act a as Manager when Plaintiff actively managed at least eight (8) engagements and interviewed for and was hired by KPMG to be a Senior Associate.

88. Mr. Novick promised Plaintiff that he would update Plaintiff's mid-year evaluation and will write Plaintiff a year-end assessment review and would read all of Plaintiff's positive reviews. However, at the direction of Masaitis and Haidysh, Novick failed to keep this promise — not only did Mr. Novick not write Plaintiff a year-end assessment, but Mr. Novick failed to present Plaintiff at the year-end assessment.

89. Mr. Novick confirmed that Masaitis approved the Low-Performance Evaluation of the Plaintiff.

90. Mr. Novick agreed with Plaintiff when Plaintiff told Mr. Novick that there is a difference between somebody not being ready for Manager and them being a low performer.

91. Mr. Novick confirmed that Human Resources did not provide him with Plaintiff's rebuttal to the Low Performance Evaluation or any of the supporting documents.


Specific False Statements made against Plaintiff and communicated by Defendants to Third Parties

92. Defendants referred to Plaintiff as a "low performer" in both written and verbal communications.

93. (i) Ziegler verbally stated and had written that Plaintiff had "low Impact Metric" and that Plaintiff was one of the lowest utilized Senior Associates in the Country.

(ii) Paragraphs 38 to 57 are incorporated in this factual allegation.

94. (i) Ziegler stated and wrote that Plaintiff "turned down opportunities to work with other practices within the tax practice."

(ii) Ziegler knew that such was a blatantly false statement as Ziegler and all of the Defendants knew that Plaintiff had volunteered and been working, day and night, on the Paycheck Protection Program engagement for Bank of America.

95. (i) Ziegler verbally stated that Plaintiff was taking work away from others.

(ii) Ziegler knew that this was a false statement when he tried to rationalize this falsity as follows: Ziegler stated that Plaintiff could have been busy on an asset management project during the pandemic and KPMG could have had others working on the deals Plaintiff had picked up.

(iii) Ziegler did not explain why Plaintiff should have abandoned his present engagement and left for another engagement when anyone else was free to sign up for the asset management project.

96. (i) Ziegler and Lin verbally stated and wrote that Plaintiff "would rather wait for M&A work to come in and that if work did not come in that you would use the time to study for your professional licensing exam."

(ii) Both Ziegler and Lin knew that this was a blatantly false statement as nobody had ever approached Plaintiff to address such an accusation.

(iii) Lin sent an email containing false statements to Ziegler, Larry Piccola, and Masaitis, stating that Plaintiff refused to be a team player. Lin knew that such was a false statement as Lin knew that Plaintiff has volunteered to work on the Bank of America PPP engagement and in 2019 worked for two straight weeks 50+ hour work weeks to assist on tax compliance for one of KPMG's biggest clients. Lin further did not communicate the following points to Zigler, Piccola, and Masaitis: When Plaintiff agreed to help with an engagement outside of M&A Tax, Christopher Bosco emailed David Lin and stated "Those roles have been filled."

David Lin purposefully withheld the fact that Plaintiff did volunteer to assist on a non-M&A Tax engagement but the roles have been filled.

(iv) Plaintiff also emailed David Lin stating as follows: "if you can't find anyone else and they absolutely need me then I will do it". David Lin replied to the Plaintiff that "It's totally your call". David Lin withheld this from Ziegler, Piccola, and Masaitis as well as Human Resources. After Plaintiff volunteered another time to assist with non-M&A work, Lin emailed Plaintiff and offered to scrap the idea because Lin knew that Plaintiff was expecting to get busy on M&A work and he was up for Manager this year. Plaintiff replied to Lin saying he is alright with scrapping the idea and Lin replied by saying "Ok, forget about it". Lin intentionally withheld this from Ziegler, Piccola, Masaitis and Human Resources.

97. (i) Ziegler verbally stated and wrote that there were occasions when Plaintiff was "assigned projects when supervisors reached out for assistance and you responded that you were too busy and you told the supervisor to reach out to your staff person.  On Project Celebration, Tonya Christianson, a Managing Director, reached out to you regarding follow-up calls and clarifications/edits to your deliverables but you were conflicted with other work."

(ii) Ziegler and Masaitis knew that all of the Plaintiff's supervisors provided Plaintiff with nothing but excellent documented reviews and feedback.

(iii) During Plaintiff's follow-up conversation with Christianson to address Ziegler's above-described statements, Christianson stated to Plaintiff that she never said these things to Ziegler and that anytime Plaintiff had a conflict, Christianson was perfectly fine with it and gave Plaintiff permission to miss a call or meeting.  Christianson told Plaintiff that she would speak to Masaitis as she was not aware that Plaintiff had any positive reviews, and Christianson told

Plaintiff that she was not aware that Plaintiff's utilization was higher than what was presented at the mid-year evaluations.

(iv) On March 18, 2019, Christianson stated in the performance evaluation: "I have no hesitation supporting Boris for Manager, as his technical skills make him ready for promotion." This performance evaluation was intentionally omitted by Haydish from Plaintiff's HR/Personnel file.

(v) When Plaintiff asked Christianson if she had connected with Masaitis, Christianson failed to respond.

(vi) Additionally, upon information and belief, the source of such information being a KPMG M&A Tax associate, Christianson was being pressured by Masaitis to come up with fabricated remarks on certain people that Masaitis wanted to get rid of, such as this associate and Plaintiff.

98. Ziegler verbally stated and wrote that Plaintiff does not thoroughly review deliverables prior to sending to supervisors.  Plaintiff's performance evaluations completely contradict this false statement.

99. (i) Ziegler verbally stated and wrote: "We have received feedback that your supervisors feel that once you have delegated work, your staff person has a firmer grasp of the facts and technical background of the project and that you defer to the associate on the project."

(ii) Ziegler's statement was blatantly false as he admitted during the call with both Plaintiff and Human Resources, on or about May 26, 2020, that, with the exception of Christianson, he did not follow up with any of Plaintiff's supervisors.

100. (i) Ziegler accused Plaintiff of "almost always consistently charging more hours than the associates" on Ziegler's engagements.

(ii) Ziegler and Masaitis expected Plaintiff to charge for less time than actually worked.

(iii) Masaitis was aware of the pressures to not charge all time worked and as a result, Plaintiff's utilization was in fact much lower than it should have been.  Masaitis being aware of this situation even stated to Plaintiff in an email with others to make sure "Boris charges all of his hours."

101. (i) Defendants stated, to one of KPMG's clients and to others at KPMG that Plaintiff "damaged the Firm's reputation."

(ii) Ziegler and Masaitis knew that this was a false statement.

(iii) Nobody from KPMG has ever approached Defendant about this allegation.

102. (i) Ziegler verbally stated and wrote: "As of April 30, 2020, you had 57 late/missing timesheets. Your timesheet compliance is 50% which is not adhering to the Tax Daily Timesheet Policy to submit your timesheet daily by 9pm eastern the following business day."

(ii) Ziegler and Masaitis knew that this was a false statement as, upon information and belief, the source of such being Latricia Gilbert (M&A Tax Resource Manager), "due to the PPP engagement that you were on, this number is off and Resource Management will make a special notation on our reporting at the end of the fiscal year to indicate this to leadership and PMLs."

103. (i) Ziegler wrote: "Communicate and discuss all offers for new work, and do not decline any opportunities before speaking with your management group to see if work can be accommodated…"

(ii) For the month of May of 2020, Plaintiff was approximately 117% utilized.

104. (i) Ziegler wrote: "You need to work towards better daily scheduling management and time management so that you can respond to supervisor requests more quickly and you should avoid referring your supervisors to the staff person you are working with on the project."

(ii) Ziegler and Masaitis knew that such was a false statement as all of Plaintiff's performance evaluations directly contradict such false statements and in fact, praise Plaintiff's timely management skills on engagements.

105. (i) Ziegler and Masaitis accused Plaintiff of providing work product that is not "well thought-out, reviewed from a tax technical and critical thinking standpoint, and does not have "all appropriate checks and references."

(ii)   Ziegler and Masaitis knew that such was a false statement as all of Plaintiff's performance evaluations directly contradict such false statements.

106. (i) Ziegler and Masitis accused Plaintiff of not having "awareness and control of all the facts of a given project" and further accused Plaintiff of "delegating all responsibility for a project to a staff person."

(ii) Ziegler and Masaitis knew that this was a blatantly false accusation as they could not point to any specific engagement and Plaintiff was never approached with any concerns with respect to this allegation.

107. (i) On or around September 21, 2020, Haidysh, verbally and in writing, made the following false statement as to Plaintiff: "Boris has struggled in various performance areas, including time management, technical, delegation, and engagement management skills."

(ii) On or around September 21, 2020, Haidysh, verbally and in writing, made the following false statement as to Plaintiff: "Boris has not actively worked to improve his performance and has repeatedly declined to take on new projects."

(iii) In her justification memorandum, dated September 21, 2020, Haidysh further defamed Plaintiff by stating that the purported year-end evaluations for 2018 and 2019 contained performance concerns or that such were addressed with Plaintiff.

(iv) In her justification memorandum, dated September 21, 2020, Haidysh further defamed Plaintiff by stating that Plaintiff did not assist with follow-up work on projects.

Ethics & Compliance Complaint

108. Plaintiff then filed an ethics and compliance complaint, which caused him not to get work offered in the manner he was offered before such was filed.

109. (i) After Plaintiff filed an ethics and compliance complaint, he was not protected in the manner pursuant to KPMG policy or pursuant to Human Resource's own promises or pursuant to KPMG's Legal department, which were supposed to protect against retaliation by not allowing a decrease in Plaintiff's workload.

(ii) Haidysh told Plaintiff: "If you're not satisfied with it [investigation], we can also work further." This was a false promise, and Haidysh knew that there would not be any working "further" as Plaintiff was notified that his employment was being terminated shortly after the conclusion of the investigation.

(iii) Haidysh intentionally excluded from Plaintiff's HR/Personnel file Plaintiff's Ethics & Compliance complaint, rebuttal and exhibits to the Low Performance Evaluation, and all other internal complaints made by Plaintiff.

110. Plaintiff was the only employee from the M&A Tax group who was not presented for the year-end evaluation.

111. One individual actually approached Plaintiff and said he heard comments about Plaintiff's job performance that were inconsistent with what is usually said about Plaintiff in performance evaluation meetings.

112. According to one other Senior Manager at KPMG, he has heard similar comments about Plaintiff as described in ¶111 above.

113. Upon information and belief, the source of such information being Plaintiff's fellow KPMG employees, including those who attended and those who did not attend mid-year evaluations, such employees were aware that Plaintiff's job performance and qualifications were being questioned and portrayed in the negative light.

FIRST CAUSE OF ACTION – ALL DEFENDANTS

(*42 U.S.C. §2000e-2*)

114. Plaintiff incorporates paragraphs 1 to 113 in this allegation.

115. Defendants discriminated against Plaintiff, in whole or in part, because he was a male with child caregiving responsibilities.

116. Defendants did not treat Plaintiff in a manner consistent with similarly-situated female employees, who, as one example, upon information and belief, were given flexible working schedules or put on performance review plans.

117. Defendants selectively enforced their policies in a discriminatory manner to the detriment of the Plaintiff.

118. As a result of the foregoing, Plaintiffs suffered actual and presumed damages, including loss of reputation, loss of employment, loss of business opportunities, mental anguish, in an amount to be determined at trial.

SECOND CAUSE OF ACTION – All Defendants

*(Retaliation — 42 U.S.C. §2000e-3)*

119. Plaintiff incorporates paragraphs 1 to 118 in this allegation.

120. Plaintiff's employment was terminated because Plaintiff would not accept a six (6)+ month assignment in San Francisco —Plaintiff explained that he has a young son and a wife, with family obligations, therefore, Plaintiff could not simply drop all of his existing engagements and family and leave to San Francisco for an unknown duration.

121. Ziegler specifically listed Plaintiff's refusal to relocate to San Francisco in the Low Performance Evaluation that Ziegler had authored, with the express approval of Masaitis, which resulted in Plaintiff's employment being terminated.

122. After the conclusion of the first Bank of America engagement, one of the leading Partners of the engagement stated that he would love for Plaintiff to continue with the second part of such engagement. Due to the pandemic and Plaintiff's parental responsibilities, Plaintiff informed Mr. Novick that Plaintiff would like to accept the second part of the engagement because it would guarantee Plaintiff's utilization and allow Plaintiff to care for his child. Mr. Novick, while stating that he understood Plaintiff's family obligations, expressed the opinion of Plaintiff performing M&A work instead.

123. (i) On March 26, 2020, Plaintiff wrote to Ziegler: "With daycare being closed around me and my son's nanny not coming in because of the whole coronavirus situation, my wife and I have been taking turns watching our son. It's almost impossible for us to get work done unless he is sleeping. But until daycare opens back up or the nanny comes back, it's hard

26

for me to get any work done." Ziegler responded by stating "I would focus leveraging the available staff to assist as needed…"

(ii) Even though Ziegler stated that Plaintiff could delegate the work as needed, such was not genuine as Ziegler and Masaitis tried to justify branding Plaintiff as a low performer by commenting on Plaintiff's leveraging/delegating.

124. Shortly after the above allegations, and the filing of the Ethics & Compliance Complaint, Defendants began to — as fully described above— fabricate Plaintiff's utilization figures, deleted Plaintiff's positive performance evaluations from his HR file, began to defame Plaintiff, withheld assignments/engagements.

125. Plaintiff has complained to Defendants' General Counsel, specifically bringing up the fact of being a male with parental responsibilities, and not being allowed a flexible schedule, as at least one of the main reasons why Plaintiff was branded a low performer and ultimately fired.

126. As a result of the above, Plaintiffs suffered actual and presumed damages, including loss of reputation, loss of employment, loss of business opportunities, mental anguish, in an amount to be determined at trial.


THIRD CAUSE OF ACTION - KPMG

*OVERTIME PAY*

(*Fair Labor Standards Act Violations: 29 U.S.C. 207(a)(1) and New York Labor Law*

*Article 19 and 12 NYCRR Sec. 142-2.2*)

127. Plaintiff incorporates paragraphs 1 to 126 in this allegation.

128. Plaintiff was not compensated for the overtime hours or for nights and weekends that he worked during the Bank of America engagement.

129. Defendants failed to compensate Plaintiff overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek.

130. Defendant's failure to pay Plaintiff overtime compensation was willful.

WHEREFORE: The Plaintiff respectfully requests relief as follows against all Defendants:

1. Awarding Plaintiff compensatory damages in the amount to be determined at trial.

2. Damages consistent with "FLSA" and "NYLL".

3. Punitive Damages as may be awarded by the jury.

4. Reasonable attorney fees necessary to prosecute this matter.

Dated: New York, NY

      September 13, 2021

*Garry Pogil*
_____
By: Garry Pogil (*Attorney for the Plaintiff*)
    1120 Avenue of the Americas, 4th Floor
    New York, NY 10036
    Tel: 212-626-6825
    Email: garry.pogil@gmail.com