UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/21/2024__

BORIS POGIL,

               Plaintiff,

      -against-

KPMG L.L.P.,

               Defendant.

21-CV-7628 (LTS) (BCM)

**OPINION & ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Boris Pogil alleges that defendant KPMG LLP discriminated against him on the basis of gender and caregiver status when it terminated his employment in October 2020 as part of a reduction-in-force (RIF). During discovery, plaintiff proffered the expert report of Joseph Rosenberg, C.F.A. (Rosenberg Rep.) (Dkt. 70-2), to support his claim for front pay. Now before the Court is defendant's motion to exclude Rosenberg's testimony. (Dkt. 70.) For the reasons that follow, defendant's motion will be granted.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   Pogil's Employment History

##### a.   Education and Early Employment

Pogil earned a bachelor's degree from St. John's University in 2010 and a master's degree in tax, also from St. John's, in 2011. Pogil Dep. (Dkt. 70-14) at 40:23-41:4. He first joined KPMG in June 2011, as a Tax Associate. *Id.* at 40:25-41:7, 42:4-5. In November 2012, he left KPMG and started work as a Senior Tax Associate in the private equity group at Ernst & Young (E&Y). another "Big 4" accounting firm. *Id.* at 42:14-18. In August 2014, plaintiff left E&Y for an in-house position at a private equity firm. *See id.* at 43:21-44:4. Less than two years later, in April 2016, he rejoined E&Y as a Senior Associate, this time in the mergers and acquisitions (M&A)

tax group, where he worked until 2018. *Id.* at 44:25-45:11. Believing that E&Y would not promote him to Manager because he was not a Certified Public Accountant (CPA), Pogil rejoined KPMG in April 2018, becoming a Senior Associate in KPMG's M&A Tax Group in New York. *See id.* at 47:12-48:7.

### b.   KPMG 2018-20

In 2019, plaintiff received generally positive written evaluations for his work at KPMG. Several evaluators, including two Senior Managers and one Managing Director, stated that they supported his promotion to Manager that year or believed he was strong candidate for promotion. *See* First Amended Complaint (FAC) (Dkt. 40) ¶¶ 25, 26, 97(iv); Pl. Mem. (Dkt. 71) Ex. 10 (Dkt. 71-10) at ECF pp. 13-15.[1] However, Pogil was not promoted at the close of KMPG's 2019 fiscal year (ending September 30), and according to Rosenberg he received a modest $5000 bonus, although he was expecting a larger one. Rosenberg Rep. at 10 n.4. The parties dispute what "message" plaintiff was given at the end of the 2019 fiscal year.[2]

In November 2019, plaintiff was asked to work on "a hot deal that needs a strong senior associate." Lin S/J Decl. (Dkt. 78) ¶ 5 & Ex. 3 (Dkt. 73-5). Plaintiff declined, telling David Lin,

---

[1] Plaintiff attached a number of exhibits directly to his opposition brief, without authenticating them in any way. However, defendant does not challenge the exhibits on that ground.

[2] Plaintiff testified at deposition that Scott Masaitis – the KPMG Principal who headed the Eastern Region of the M&A Tax Practice – told plaintiff, "I promise you, you're gonna get promoted next year, you're on the partnership track." Dkt. 85-30 at 93:21-23. Masaitis attests that when he met with plaintiff in August 2019, and told him was not being promoted that year, he provided "feedback" regarding plaintiff's "inconsistent performance, including not being proactive, not taking ownership, and failure to demonstrate leadership." Masaitis S/J Decl. (Dkt. 76) ¶ 11. According to Masaitis, management was also concerned about plaintiff's "[u]tilization for FY2019," which was "below goal, at 57%, when it should have been 70%." *Id.* Utilization was a KPMG performance metric measuring the number of client-chargeable hours worked by the employee against the number of available hours in the period. *Id.* ¶ 12. Masaitis attests that he told plaintiff that if he wanted to be promoted, "he needed to demonstrate a commitment in these areas, and that [Masaitis] expected him to 'hit it out of the park.'" *Id.* ¶ 11.

the National Resource Manager of the M&A Tax Practice, that he was "too busy this week and next on multiple deals plus leading a huge business development proposal." *Id*. Ex. 3. Lin notes, however, that plaintiff had poor utilization in both November (24.5 chargeable hours) and December (65.5 chargeable hours). *Id*. ¶¶ 5-8 & Ex. 4 (Dkt. 73-6).

In early 2020, Pogil's superiors became increasingly concerned about his continuing low utilization. Masaitis S/J Decl. ¶ 13-17. On January 30, 2020, Masaitis sent Plaintiff a pointed email noting that his month-to-date utilization (14.1%) and year-to-date utilization (30.9%) were low compared to his peers. *Id*. ¶ 15 & Ex. 9 (Dkt. 73-11). Among the 19 Senior Associates in the M&A Tax Group, 15 had month-to-date utilization figures higher than plaintiff's, and 18 had year-to-date utilization figures higher than plaintiff's. *Id*. Masaitis reminded plaintiff that his utilization would be "a key component in calculating your Impact score," and recommended that plaintiff "continue to be proactive in getting work." *Id*.

On February 4, 2020, plaintiff's supervisor David Ziegler, together with one of the M&A Tax Partners, met with plaintiff to reinforce that message. Ziegler S/J Decl. (Dkt. 77) ¶ 5. During that meeting, Ziegler asked plaintiff why he had not volunteered for a project recently offered to him (and others) to work with the Economic Valuation Services (EVS) Tax practice in San Francisco. *Id*. Plaintiff explained that he had a young child and did not want to be in California for six months. *Id*.; *see also* FAC ¶ 5(ii) (plaintiff told Ziegler that he had a young son and "childcare responsibilities that would not allow him to relocate to San Francisco for six months").

The next day, February 5, 2020, plaintiff was offered another project – in New York – that was expected to last several months and involved working with the Business Tax Service (BTS) Compliance Group. Masaitis S/J Decl. ¶ 18; Lin S/J Decl. ¶ 13. Plaintiff accepted the assignment, *see* Lin S/J Decl. Ex. 12 (Dkt. 73-14), and Lin let the BTS Compliance Group know that he could

start "right away." *Id*. Ex. 13 (Dkt. 73-15). The next day, however, plaintiff changed his mind, telling Lin that he would "rather wait for M&A work to come in," and that if it did not come in he would "use the time to study." *Id*. ¶ 14. This was "very frustrating and embarrassing" for Lin and the M&A Tax Practice, because it "made us look bad to the people in BTS." *Id*.

Lin reported these events to Ziegler, Masaitis, and other senior KPMG personnel. *See* Lin S/J Decl. ¶ 14 & Ex. 15 (Dkt. 73-17). Masaitis thought that "this was an unprofessional action by Boris," and merited a "Low Performer Memo ('LPM')." Masaitis S/J Decl. ¶ 21 & Ex. 17 (Dkt. 73-19). On February 12, 2020, Ziegler discussed plaintiff with Human Resources (HR) Manager Lara Czerwinski. *See* Czerwinski S/J Decl. (Dkt. 79) ¶ 3. According to Czerwinski's notes of that call, Ziegler stated that Pogil was on the "low end of chargeability," noted that he had turned down the EVS opportunity because of his "young son" but was "open" to "local rotations," and explained that Pogil initially agreed to take the BTS assignment, only to "decline[]" it "24 hours later." Pl. Mem. Ex. 3 (Dkt. 71-3). Ziegler commented that given plaintiff's "low utilization," he "[s]hould not turn down assignments," and asked, "How can we think he's on track for promotion to manager?" *Id*.

On March 29, 2020 – a few weeks into the Covid-19 pandemic, at which point most employees were working from home – plaintiff informed Ziegler by email that "daycare is closed and our nanny refuses to come in." G. Pogil S/J Aff. (Dkt. 85) Ex. DDD (Dkt. 85-58). Therefore, plaintiff explained, "I have to take care of my son with my wife who is also working from home so I will be limited in what I can do workwise until the situation gets better." *Id*. By the end of that month, plaintiff's year-to-date utilization somewhat improved, at 37.8%, but this was still the "lowest among Senior Associates in the Eastern Region." Lin S/J Decl. ¶ 16 & Ex. 20 (Dkt. 73-22).

From April through July 2020, plaintiff worked on a pandemic-related project for KPMG's client Bank of America (BOA), assisting it with Paycheck Protection Program (PPP) loan applications.

*See* Masaitis S/J Decl. ¶ 38. The PPP project improved plaintiff's utilization figures, but was not highly valued by KMPG, in part because it "had nothing to do with M&A Tax, or even Tax," and in part because, according to Masaitis, "the hourly rate KPMG was charging for work on the BOA PPP project was extremely low." *Id*.; *see also* Pogil S/J Cert. (Dkt. 84-49) (explaining that on the PPP project, KPMG employees "were asked to perform duties that normally a bank employee would perform").

On a May 12, 2020, phone call, Masaitis gave plaintiff his mid-year (interim) review. Hughes S/J Decl. (Dkt. 75) Ex. 22 (Review Tr.) (Dkt. 73-24).[3] Masaitis told plaintiff that in light of his low utilization (29% for the five months ending in February 2020, when the firm was "operating at full capacity" pre-Covid), "it's going to be very difficult to – nearly impossible for there to be a promotion this year." Review Tr. at 4:3-23. Plaintiff pushed back, noting that his utilization had improved to "45, 46," including his work on the PPP program. *Id*. Ziegler replied that this was still "well below the goal of a senior associate," *id*., explaining that the "average for a senior associate was 60 percent," or twice plaintiff's pre-Covid utilization, making it "sort of difficult to put those numbers up and say this is someone we're going to promote." *Id*. at 6:11-16. Ziegler then advised plaintiff that he was putting together "a low performance memo," making the odds of a promotion that year "slim." *Id*. at 7:2-5. Ziegler told Pogil that turning down the BTS project had "reflected poorly" on him, *id*. at 16:5, to which plaintiff responded that at the time he "picked up a ton of work" in M&A Tax, and "didn't see the need to go over to BTS[.]" *Id*. at 17:21-23.

On May 26, 2020, plaintiff received a formal LPM, written by Ziegler. FAC ¶ 11; Pl. Mem. Ex. 16 (Dkt. 71-16) (LPM).[4] The LPM advised plaintiff that his performance was "below expectations," noting that his "FY20 Impact Metric through April 30, 2020 was 57% as compared

---

[3] Exhibit 22 is a transcript of the call, created "from an audio recording" which plaintiff "produced in discovery." Hughes S/J Decl. ¶ 5.

[4] The version of the LPM submitted with plaintiff's motion papers includes his lengthy responses, which are interlineated into the body of the memo within brackets.

to the target for senior associates in the M&A Tax Group of 80%," but that he had nonetheless "turned down opportunities to work with other practices within the tax practice." LPM at 1. Ziegler referenced both the EVS project in San Francisco and the "two-to-three month engagement within the BTS Asset Management practice to do a tax compliance engagement," which plaintiff declined because he preferred to wait for M&A work to pick up and use any downtime "to study for [his] professional licensing exam." *Id*. at 2. The LPM also advised plaintiff that he tended to over-delegate to more junior staff and failed to comply adequately with KPMG's Tax Daily Timesheet Policy. *Id*. at 3-5.

Plaintiff responded heatedly to the LPM, writing, among other things, that his performance reviews "completely prove the opposite of this defamatory statement that I am a low performer," and characterizing Ziegler's critique of his utilization as a "compete lie." LPM at 1. With respect to the San Francisco EVS project, Pogil wrote that he turned it down because he had "already picked up deals that started moving," and because he had "family obligations," such that "I would not be able to just drop my engagements and family and leave to San Francisco for 6+ months." *Id*. at 2. With respect to the BTS opportunity, plaintiff did not explain why he turned it down, but wrote that he "never said that [he] would use the time to study for a professional exam." *Id*.[5]

On May 31, 2020, plaintiff appealed his LPM internally, through the KPMG Ethics & Compliance (E&C) Group, asserting that it was "'completely without merit,' contains false statements, and contradicts prior performance reviews." Hughes S/J Decl. Ex. 32 (Inves. Rep.) (Dkt. 73-34) at 1. Plaintiff accused Ziegler of "lies and attempts to assassinate my character,"

---

[5] In fact, he did. In a February 6, 2020 email to Managing Director Tonya Christianson, plaintiff wrote that he told Lin "to take me off the BTS stuff" and that he was "only going to do M&A work or study for my exams on my down time." Hughes S/J Decl. Ex. 16 (Dkt. 73-18).

Inves. Rep. at 3, beginning after plaintiff's March 29, 2020 email regarding his Covid-related childcare responsibilities. *Id*. at 4. Plaintiff added, "I'm not sure if I'm being discriminated against for having a child that I need to take care of during the pandemic, but prior to me sending this email there was never a mention by anyone with respect to any 'low performance' on my end.'" *Id*.

Plaintiff also contacted HR Manager Alena Haidysh to give her "his version of events," *see* Haidysh S/J Decl. (Dkt. 92) ¶ 5, and on June 16, 2020, Haidysh – who was not otherwise involved in the E&C investigation – sent an email to Joshua Ellis, the KPMG attorney leading the investigation, in which she wrote:

> Overall, from the supporting documentation perspective, I think we only have low utilization and maybe timesheet compliance that could potentially be used in an LPM under the normal circumstances. In the pandemic/economic crisis environment, I don't think we should be relying on utilization to justify an LPM, especially considering the firm's commitment to allowing all employees to charge the COVID time code and not letting low utilization have adverse effects during performance evaluations.

Pl. Mem. Ex. 11 (Dkt. 71-11).[6]

The E&C team interviewed plaintiff, Ziegler, and seven other KPMG witnesses. *See* Inves. Rep. at 9-17. On September 10, 2020, it concluded that plaintiff's "allegations were unsubstantiated." *Id*. at 9.[7]

---

[6] The parties dispute the significant of Haidysh's email. Plaintiff characterizes it as evidence that "KPMG's own Human Resource department appears to have determined that Plaintiff did not meet the criteria" for a low performer memo. Pl. Mem. at 17. Haidysh attests that she was "not aware," when she wrote the email, "that Mr. Pogil's Utilization had been extremely low for a sustained period of time before the pandemic struck." Haidysh S/J Decl. ¶ 5. She states that her email was intended to "express a general concern about giving an LPM based on low Utilization during the COVID-19 pandemic," and that "[w]hen the E&C investigators confirmed for me that the information in the LPM was correct, I was confident that it was appropriate." *Id*.

[7] The E&C team also investigated whether plaintiff recorded his May 12, 2020 conversation with Masaitis in violation of the firm's "No Recording Policy." Inves. Rep. at 17. Plaintiff denied making a recording, *id*., and the investigation concluded with "insufficient data to reach a finding." *Id*. at 18.

In July 2020, Masaitis learned that KPMG was undertaking a RIF that would "impact all practices" and require M&A Tax to cut positions. Masaitis S/J Decl. ¶ 33. According to Masaitis, four M&A Tax employees "identified as low performers at interim," including plaintiff, "automatically went on the RIF list." *Id.* ¶ 35; *see also id.* Ex. 27 (Dkt. 73-29) (RIF list as of August 14, 2020). KPMG terminated Pogil's employment on September 29, 2020, effective October 16, 2020. *See* Pl. Mem. Ex. 2 (Dkt. 71-2) (email scheduling separation meeting); Hughes Decl. (70-1) Ex. B (Dkt. 70-3) (separation letter); Masaitis Decl. (Dkt. 70-16) ¶¶ 3-4. Overall, 1400 KPMG employees were terminated nationwide, including 20 in the M&A Tax practice. Masaitis Decl. ¶ 3.

Pogil's annual salary, at the time of his termination in 2020, was $160,000. *See* Bede S/J Decl. (Dkt 81). According to Rosenberg, had plaintiff been promoted to Manager that fall, his salary would have been increased to $180,000. Rosenberg Rep. at 12.

### c.    Post KPMG

In December 2020, Pogil was hired as a Manager at Grassi & Co. (Grassi), with a starting salary of $165,000. Pogil Dep. at 11:12-22; Hughes Decl. Ex. C (Dkt. 70-4) (Grassi offer letter). While at Grassi, which did not have an M&A tax practice, plaintiff worked primarily on employee retention credit programs. Pogil Dep. at 11:2-11; *see also* Pogil Cert. (Dkt. 71-17) at 2 (characterizing that work as "not something I had any intention or desire to do"). A year later, in December 2021, when Pogil left Grassi to pursue M&A tax work, *see* Pogil Dep. at 13:7-21, his salary had increased to $177,000 and he had received a bonus of $20,000. *Id.* at 12:2-4.

In February 2022, plaintiff started working at WithumSmith+Brown (Withum) as a Tax Manager in the firm's M&A Tax group. *See* Pogil Dep. at 15:4-10. His starting salary at Withum was $180,000, with a sign-on bonus of $10,000 and a second bonus of $5,000. *Id.* at 15:9-24; Hughes Decl. Ex. D (Dkt. 70-5) (Withum offer letter). As of August 2022, he was still employed at Withum and making a salary of $190,000. Pogil Dep. at 15:9-24.

In sum, over the first 11 years of his career (2011-22), plaintiff held seven different jobs, at six firms, with an average tenure of approximately 19 months. Except for his termination from KPMG in 2020, all of his job changes were voluntary. By 2022, he was working as a Tax Manager in an M&A Tax practice (albeit at a smaller firm), at an annual salary that was $30,000 higher than his last salary at KPMG, with a bonus larger than any he had received at KPMG.

### 2.   KPMG's 401(k) Plan

While Pogil was employed by KPMG, the company offered a 401(k) plan that permitted employees to contribute pre-tax dollars to the plan and "included company-provided Matching Contributions." Hughes Decl. Ex. E (KMPG 401(k) Summary Plan Description (SPD)) (Dkt. 70-6) at 7. Pogil never made any 401(k) contributions while employed at KPMG, and thus never received a matching contribution from KPMG. Rosenberg Rep. at 3.

Beginning on January 1, 2022 – more than a year after Pogil's termination – KPMG debuted its "401(k) Capital Accumulation Plan" (CAP), which untethered company contributions from employee contributions. *See* SPD at 4, 7. Under the CAP, employees are "not required to contribute [their] own money to the Plan in order to receive a CAP Contribution" from KPMG. *Id.* at 7. To be eligible for a CAP Contribution, a KMPG employee must be over twenty-one years old and have completed one year with the firm. *Id*. Contributions are calculated as a percentage of the employee's compensation, with percentages ranging from 6% to 8% determined by a formula that includes the employee's age, years of service, and job level. *Id*. at 15.

### B.   Procedural History

### 1.   Litigation

Plaintiff filed this action on September 13, 2021, against KPMG and six individual KPMG employees, alleging three causes of action under Title VII and state law. Dkt. 1. On defendants'

motion (Dkt. 5), which plaintiff did not oppose (*see* Dkt. 8), the Hon. Vernon S. Broderick, United States District Judge, dismissed all of plaintiff's claims against the individual defendants on February 7, 2022. (Dkt. 12.)

Plaintiff amended his complaint on June 28, 2022, alleging: (1) that KPMG discriminated against him in violation of Title VII, 42 U.S.C. § 2000e-2, by terminating his employment "because he was a male with child caregiving responsibilities," FAC ¶ 122; (2) that KPMG retaliated against him in violation of Title VII, 42 U.S.C. § 2000e-3, by terminating him after he submitted his rebuttal to the LPM, which explained that he had turned down the San Francisco engagement because of his childcare responsibilities, *id.* ¶ 128; and (3) that KPMG failed to compensate him for his overtime hours while he worked on the PPP project, in violation of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), and comparable provisions of state law. *Id.* 137-39.[8]

### 2.   The Rosenberg Report

Plaintiff served an initial version of the Rosenberg Report on December 14, 2022, and a revised version on January 27, 2023. *See* Hughes Decl. ¶ 5. The report was updated again on February 9, 2023, following Rosenberg's deposition. *Id.*; *see also* Rosenberg Rep. at 1. In the updated version – which is now before the Court – Rosenberg explains that the primary function of his report is to estimate a specific category of "front pay" loss that plaintiff claims to have incurred as a result of losing his job at KMPG, namely, the benefits of the 2022 version of the KPMG 401(k) plan. *See* Rosenberg Rep. at 6 ("Mr. Pogil's loss of not participating in 401K plan

---

[8] In addition to the instant action, Pogil sued KPMG and seven individual KPMG employees in state court, alleging that the LPM was defamatory and that defendants violated state and local discrimination laws by firing him because he was a man with childcare responsibilities. On January 29, 2024, the Hon. Shlomo S. Hagler, J.S.C., granted summary judgment to defendants on all claims and dismissed the case. *See* Decision + Order on Motion (Doc. No. 163), *Pogil v. KPMG, LLP*, No. 150640/2021, 2024 WL 343937 (N.Y. Sup. Ct., N.Y. Cnty., Jan. 29, 2024).

with its employer's CAP contributions is the crux of the economic losses that are calculated in this report."); Rosenberg Dep. (Dkt. 70-13) at 17:7-8 ("The main focus on the loss was the loss of the 401k plan and the capital contributions.").

Rosenberg estimates those lost benefits under the following assumptions:

(i)    But for his termination in October 2020, plaintiff would have remained employed by KPMG for the next 33 years, to age 65 and a half, *see* Rosenberg Rep. at 6 ("assuming a Work Life Expectancy [] resulting in an effective retirement at the age of 65.5");

(ii)    During those 33 years, plaintiff would have been promoted, either once, twice, or three times at KPMG, *see id.* ("An assumption is made that at a minimum, Mr. Pogil would have been promoted to Manager as had effectively been recommended by his superiors prior to his wrongful termination."); *id.* at 10 (describing "three alternative advancement scenarios");

(iii)    During those 33 years, in addition to his promotions, plaintiff would have received annual salary increases (ranging from 6.66% in the early years of his presumed KPMG career to 3.72% in the later years), based on "the average real wage and salary growth rates for all U.S. workers as projected by the Congressional Budget Office," and annual bonuses of 10%, *see id.* at 10, 12-15 (Scheds. 2-4);

(iv)    KPMG will keep its current 401(k) CAP plan in place throughout plaintiff's presumed career, and thus would have contributed a sum equal to at least 6% of plaintiff's wages from 2022 through his retirement at age 65 and a half, *see id.* (Scheds. 2-4);

(v)    Plaintiff would have chosen to invest his KPMG 401(k) CAP contributions fairly aggressively, at an 80/20 equities/fixed income ratio (or at least at 60/40), *see id*. at 15; and

(vi)     The stock market will perform, over the next 33 years, roughly as well as it did over the 95 years between 1926 and 2021. *See id.* at 24.

All of Rosenberg's calculations assume, at minimum, that Pogil would have been promoted to Manager (rather than fired) in the fall of 2020. Rosenberg Rep. at 10. "Scenario 1" assumes that he would have remained at KPMG as a Manager from 2020 until his retirement in 2053. *Id*. "Scenario 2" assumes a further promotion to Senior Manager in 2023. *Id*. "Scenario 3" assumes a third promotion, to Managing Director, 2027. *Id*. As noted above. each scenario further assumes that, in addition to his promotions, Pogil would receive annual raises and bonuses. Having thus projected Pogil's annual compensation for the next 33 years under each scenario, Rosenberg calculates the annual 401(k) CAP contributions that KPMG would make on his behalf. *Id*. at 12-15 (Scheds. 2-4).

Next, Rosenberg divides each scenario into two sub-scenarios, one based on the assumption that Pogil would have invested KPMG's 401(k) CAP contributions at an 80/20 ratio and the other assuming a 60/40 ratio. Rosenberg Rep. at 7. Finally, assuming that the stock market would continue to generate historical returns, Rosenberg uses a "Monte-Carlo" simulation to arrive at six possible values for Pogil's hypothetical 401(k) account as of 2053 – including 33 years' worth of contributions and 33 years' worth of stock market gains – which he then discounts to present value. *Id.* at 9 (Sched. 1), 15-16, 17-19 (Scheds. 5-7).

A Monte-Carlo simulation is a type of statistical analysis which "produces a distribution of probable outcomes based on statistics estimating a population's mean and standard deviation,

usually assuming a relatively normal distribution." Rosenberg Rep. at 15. For each of the six scenarios he assumes, Rosenberg presents the outcome at the 25th, 50th, and 75th percentiles, as well as the upper and lower bound, and discounts each figure to present value. *Id.* at 17-19 (Scheds. 5-7). Rosenberg explains that "the median or 50th percentile values are the most typical result," *id.* at 15-16, and hence uses those values to conclude that, as a result of his termination from KPMG in 2020, Pogil lost a stream of future 401(k) CAP contributions, plus investment earnings on those CAP contributions, worth somewhere between $607,999 (Scenario 1B: one promotion, 60/40 investment ratio) and $2,232,736 (Scenario 3A: three promotions, 80/20 investment ratio) in present dollars. *Id.* at 7. Rosenberg concludes that "the range of three promotional scenarios had Mr. Pogil remained at KPMG, provides a set of reasonably possible outcomes which should each be considered upon their merits, as to their relative likelihoods in assessing the most appropriate economic losses borne by Mr. Pogil." *Id.* at 16. He offers no opinion as to which of the scenarios is the most "likely." *Id.*

Because Pogil has "no history" of actually participating in any of the 401(k) plans available to him at his various employers (and because most 401(k) plans require the employee to make a contribution before the employer will make an additional or "matching" contribution on the employee's behalf), Rosenberg's initial report made no effort to net out any matching 401(k) contributions that plaintiff's current or future employers may make. Rosenberg Rep. at 7. In other words, Rosenberg assumed that Pogil will never be willing to contribute any of his salary to a 401(k) plan in order to generate matching contributions from his employer. In his revised report, however, he presents a set of "hypothetical results," for "illustration only," showing that *if* plaintiff received matching contributions of 2.5% annually from Withum (or from another employer), the present value of that stream of matching contributions, including investment earnings, would be somewhere between $199,377 (Scenario 1D) and $627,400 (Scenario 3C). *Id.* at 1, 25-28 (Scheds.

APP 3-APP 4). Rosenberg states that these hypothetical results assume "the same base income" as in his KMPG scenarios. *Id*. at 8.

Rosenberg makes it clear that his opinion is limited to "Mr. Pogil's loss of not participating in the [the KPMG] 401K plan with its employer's CAP contributions[.]" Rosenberg Rep. at 6. Thus, although he devotes a number of pages in his report to the differences between "Big 4" compensation and compensation at smaller accounting firms, and refers somewhat cryptically to the "possible [r]eputational [d]amage that Mr. Pogil suffered due to the manner of his termination from KPMG," *id*. at 5, he does not calculate or offer any opinion as to "the direct long term differential in salary and bonus possibilities" between plaintiff's current career trajectory and his hypothetical KPMG career. *Id*. at 6; *see also* Rosenberg Dep. at 19:3-4 ("I limited my analysis to only the pension differential or the pension loss."). Thus, for example, Rosenberg "did not make any assumption about whether [plaintiff] would stay at WithumSmith" and did not "do a projection of what his income would have been at WithumSmith, what promotions he might have been entitled to, or obtained, and so forth." *Id*. at 20:17-24.

Rosenberg supports his assumption that Pogil is likely to remain in the workforce for the next 33 years (to age 65 and a half) by referencing the statistical Work Life Expectancy (WLE) of a 32-year-old male with a master's degree. Rosenberg Rep. at 6 n.3. As to the remainder of the assumptions underlying his analysis, however, he offers no expert opinion, no data, and no other support. Thus, for example, Rosenberg makes no effort to explain why he assumed that Pogil would spend ahis entire working life at KPMG. When asked to do so, at deposition, he stated only:

"My calculations are based on that assumption. There's no reason to believe he wouldn't have." Rosenberg Dep. at 20:9-11.[9]

As for the "main assumption in all 3 scenarios," namely, that plaintiff would have been promoted to Manager at KPMG in 2020 if he had not been fired that year, plaintiff's expert writes that it is based on "the numerous comments regarding his performance cited in the Background section of this report." Rosenberg Rep. at 10 n.4. However, Rosenberg does not claim to be familiar with KPMG's promotion criteria or the firm's minimum requirements for the Manager position. Rosenberg Dep. at 80:7-14. And when asked, at deposition, if he were offering an expert opinion "as to whether Mr. Pogil should have been promoted to [M]anager at KPMG," he demurred, responding, "No. I'm doing hypotheticals." *Id*. at 49:12-15. Similarly, when asked if he were offering an opinion as to "whether [plaintiff] would have been promoted to [S]enior [M]anager at some point if he had remained at KPMG," Rosenberg responded, "I am not offering an opinion as to the certainty of any of those promotions." *Id*. at 49:16-21. This is consistent with the language used in his written report, which states that "[t]wo further advancements to higher level positions" were "considered," but makes no attempt justify those assumptions. Rosenberg Rep. at 6.

### 3.    Defendant's Motion

KPMG challenges the Rosenberg Report on three bases. First, it argues that the entire report is irrelevant to the issues in this action because, as a matter of law, plaintiff is not entitled to front pay damages, having quickly obtained comparable employment at a higher salary than he ever earned at KPMG. Def. Mem. (Dkt. 70-17) at 14-16. Second, defendant contends that

---

[9] Rosenberg conceded that he did not do any analysis of the "average or median tenure of employees at KPMG" or of "professionals at any Big 4 firm." Rosenberg Dep. at 26:7-21. Nor did he consult federal Bureau of Labor statistics concerning "job tenure in the work force." *Id*. at 28:7-24. He further conceded that the WLE statistics he did look at are not "relevant for determining how long an individual will remain at any particular employer[.]" *Id*. at 27:5-15.

Rosenberg has improperly multiplied plaintiff's future 401(k)-related losses by calculating *both* the hypothetical stream of 401(k) CAP contributions that would have been made by KPMG over the next 33 years *and* 33 years of hypothetical investment earnings before performing a present-value calculation – notwithstanding that front pay awards, by definition, are made *before* the loss occurs, such that, if plaintiff receives such an award, he will be free to invest it "all over again." *Id*. at 17-19. Third, defendant argues, the Rosenberg Report is unreliable at every step, because it "layers unrealistic assumption upon unrealistic assumption," beginning with the assumption that but for his termination in October 2020 plaintiff would have been promoted to Manager that fall and continuing with the alternative assumptions that he would have been promoted to Senior Manager and/or to Managing Director; the further assumption that, regardless of how many times he was promoted, plaintiff would have remained at KMPG for more than three decades, until retirement; and the added assumption that throughout this period KPMG will offer the same generous 401(k) CAP plan that it adopted in 2022. *Id*. at 19-24.

In his opposition memorandum, plaintiff argues that that he is entitled to front pay because his current employment is not "comparable" to the KPMG job he lost, Pl. Mem. at 4-14, and – apparently in the alternative – that the issue of comparable employment is "not a proper part" of the present motion, because it must ultimately go to the jury. Pl. Mem. at 7. He defends Rosenberg's inclusion of projected 401(k) investment returns on the ground that "[t]he whole point of KPMG's 401(k) CAP feature is to invest," *id*. at 13, noting that "pension plans grow with the market." *Id*. at 15. Finally, plaintiff argues that Rosenberg has provided "a very conservative estimation using a reliable methodology," pointing out that he assumes that plaintiff's annual bonus at KPMG will be only 10% each year, and does not extend his model past age 65 and a half, even though Pogil

could well work until age 70. *Id*. at 16-17.[10] Plaintiff concludes by arguing that KPMG's challenges to the Rosenberg Report go to its weight, not its admissibility, and that KPMG "did not meet their burden on this motion." *Id*. at 20.

In its reply brief, defendant stresses the Court's "gatekeeping" function regarding expert testimony and points out that, pursuant to Fed. R. Evid. 702, it is the proponent of such testimony who bears the burden of showing, by a preponderance of the evidence, that it is admissible. Pl. Reply Mem. (Dkt. 72) at 2.

## II.   DISCUSSION

### A.   Legal Standards

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b)   the testimony is based on sufficient facts or data;

> (c)   the testimony is the product of reliable principles and methods; and

> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[T]he proponent of expert testimony must show its admissibility by a preponderance of the evidence." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 700 n.6 (S.D.N.Y. 2003).[11]

---

[10] The remainder of plaintiff's brief argues the merits of his liability case, *i.e.*, that he was not in fact a "low performer," but was improperly terminated because of his child-care responsibilities. See Pl. Mem. at 17-20. These arguments do not bear on the motion now before the Court.

[11] Then "more likely than not" language was added to Rule 702 in 2023 "to clarify and emphasize" this point. Fed. R. Evid. 702, advisory committee's note to 2023 amendment.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, explaining that the Rules of Evidence – and Rule 702 in particular – "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case."). "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *14-15 (S.D.N.Y. Sept. 28, 2023) (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

An expert's analysis must be "reliable at every step," meaning that "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)) (emphasis in original); *cf. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) ("So long as 'an expert's analysis [is] reliable at every step,' it is admissible."). Thus, the court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Expert testimony must also be excluded "if it is speculative or conjectural," or if it relies upon "unrealistic assumptions." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)

(excluding expert testimony as to plaintiff's future earnings where expert used unrealistic assumptions regarding plaintiff's future employment prospects, at odds with his actual employment history); *see also Carroll v. United States*, 295 F. App'x 382, 385 (2d Cir. 2008) (upholding exclusion of expert testimony as to plaintiff's lost earnings "as a physician or physician's assistant" where plaintiff "never worked as a physician's assistant and never took the licensing exam necessary to practice medicine"). It is the district court's prerogative to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Boucher*, 73 F.3d at 21 (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)). If he did, "other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Id.* (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir.), *cert. denied*, 506 U.S. 826 (1992)).

The court properly focuses on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Amorgianos*, 303 F.3d at 266 (courts "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions"). It is not the role of the Court to determine whether the expert's conclusions are right or wrong. *See in re Paoli*, 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). But if flaws in the expert's reasoning are "large enough" that "the expert lacks 'good grounds' for his or her conclusions," the testimony should be excluded. *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli*, 35 F.3d at 746); *see also Kumho Tire*, 526 U.S. at 153 (upholding exclusion of expert testimony that "fell outside the range where experts might reasonably differ").

### B.        Application

Defendant does not challenge Rosenberg's credentials as a financial analyst and economist.[12] It does challenge the relevance of his report, as well as its reliability. I address each issue in turn.

### 1.        Relevance

Defendant contends that the Rosenberg Report is irrelevant, no matter how strong or weak the analysis is, because, even if plaintiff establishes liability, he will not be entitled to any front pay award. This question, in turn, depends on whether plaintiff has obtained (or could obtain) "comparable" employment. *See Olaechea v. City of New York*, 2022 WL 3211424, at *9 (S.D.N.Y. Aug. 9, 2022) ("[F]ront pay may be awarded only when the 'factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996)).

"'Comparable' employment need not be 'identical' employment, either in job duties or remuneration." *Hill v. Airborne Freight Corp.*, 2003 WL 366641, at *4-5 (E.D.N.Y. Feb. 20, 2003); *see also Bonura v. Chase Manhattan Bank, N.A.*, 629 F. Supp. 353, 362 n.3 (S.D.N.Y. 1986) (declining to award front pay where plaintiff found "comparable, though not identical, employment" at another bank, where his starting salary was "somewhat less than the salary he was drawing when he left Chase," but he then received "several moderate salary increases," and "garner[ed] many if not most of the fringe benefits"). However, a salary differential coupled with a significant difference in available benefits could support the conclusion that a plaintiff's new job

---

[12] Rosenberg holds an M.B.A. and is a Chartered Financial Analyst who offers expert testimony and litigation support in a wide variety of cases, including "cases of personal injury (PI); wrongful death (WD); wrongful termination (WT);medical/professional malpractice; commercial damages/business interruption/lost profits; mortgage fraud; damaged credit; and FINRA arbitration hearings." Pl. Mem. Ex. 1 (Dkt. 71-1).

is not "comparable" to the one he lost. *Buckley v. Reynolds Metals Co.*, 690 F. Supp. 211, 215-16 (S.D.N.Y. 1988).

The parties devote many pages of their briefs to the question whether plaintiff's current job at Withum is or is not comparable to his old KPMG job. Plaintiff insists that it is "not even remotely comparable," Pl. Mem. at 7, and further contends that there is "no likelihood of him obtaining comparable employment" in the future, because he does not have the qualifications (a CPA license, a J.D. degree, or an Enrolled Agent certification) required for advancement at the other "Big 4" accounting firms, which in any event do not offer a comparable 401(k) plan. *Id*. at 7-8. Defendant points out that plaintiff is performing similar M&A tax work at Withum, with a more senior title, and is already "making *more* money than he was making at KPMG." Def. Mem. at 16 (emphasis in original). Moreover, defendant argues, Pogil could "readily become an Enrolled Agent," and in fact was studying for the exam while at KPMG – because it was also "a requirement to be promoted to Manager" at KMPG. Def. Reply Mem. at 8-9.

Plaintiff is correct, however, that this issue is ill-suited for determination on the present record. Whether or not a plaintiff has obtained (or can obtain) comparable employment is "ultimately a question for the jury to decide," *Adams-Flores v. City of New York*, 2024 WL 519819, at *1 (S.D.N.Y. Feb. 9, 2024) (denying motion *in limine* to exclude front pay evidence), unless, of course, the evidence permits the court to dispose of the issue on summary judgment. *See, e.g.*, *Taylor v. Polygram Recs.*, 1999 WL 124456, at *26 (S.D.N.Y. Mar. 8, 1999) (granting motion for summary judgment in part and cutting off plaintiff's entitlement to back pay on the date she rejected a comparable job offer). Here, although defendant has moved for summary judgment on other grounds (Dkt. 73), it does not seek a ruling on the "comparable employment" issue. The Court therefore declines to exclude Rosenberg's testimony on the basis of relevance.

### 2.   Assumptions

Although "front pay awards always involve some degree of speculation," *Chisolm v. Liberty Lines Transit Inc.*, 2013 WL 452408, at *7 (S.D.N.Y. Feb. 6, 2013) (quoting *Bethlehem Steel*, 958 F.2d at 1189), "it is well settled that 'under no circumstances can . . . [a front pay] award be based on undue speculation[.]'" *Press v. Concord Mortg. Corp.*, 2010 WL 3199684, at *2 (S.D.N.Y. Aug. 11, 2010) (quoting *Rivera v. Baccarat, Inc.*, 34 F. Supp.2d 870, 878 (S.D.N.Y.1999)). Moreover, "[a] plaintiff seeking front pay has the same burden to prove a non-speculative basis on which to calculate damages as a plaintiff seeking back pay." *Sanderson, v. LEG Apparel LLC*, 2024 WL 898654, at *5 (S.D.N.Y. Mar. 1, 2024).

"The longer a proposed front pay period, the more speculative the damages become." *Peyton v. DiMario*, 287 F.3d 1121, 1129 (D.C. Cir. 2002) (quoting *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992), and reversing front pay award for 26 years of future losses as "unduly speculative and therefore an abuse of discretion"). Consequently, front pay awards typically cover a short period of time. *See, e.g.*, *Graham v. Prizm Assocs., Inc.*, 2022 WL 20403411, at *5-6 (S.D.N.Y. Jan. 10, 2022) (3 years of front pay is "reasonable and within the range of comparable cases in this district"); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 96 (E.D.N.Y. 2020) ("A two-year award of front pay, based on the difference between plaintiff's past and current earnings, is customary.")

Extraordinary circumstances can, in certain cases, justify extended front pay awards. Typically, longer awards are made in favor of plaintiffs who spent decades working for the defendant employer – thus establishing a "track record" that can be extrapolated into the future – and who, due to age or niche skills, are unlikely ever to find comparable employment. *See, e.g.*, *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (upholding award of front

pay until full retirement age to 44-year-old plaintiff wrongfully demoted from his position as Metro North's Superintendent of Train Operations, because plaintiff had only a high school education and had worked for Metro North since age 22, rising through the ranks to a position that was "so specialized as to be virtually unique," making it highly unlikely that he could find a comparable job elsewhere); *Bethlehem Steel*, 958 F.2d at 1179 (upholding award until retirement age for 48-year-old salesman who was terminated after 26 years at Bethlehem Steel and was still unemployed at the time of trial); *Buckley*, 690 F. Supp. at 216-18 (awarding front pay based on 9 years of lost pension benefits to 56-year-old plaintiff who was unlawfully terminated after 25 years of service to Buckley).[13]

In the case at bar, neither plaintiff nor his expert identifies any extraordinary circumstances that could justify a 33-year front pay projection for a 32-year-old accountant terminated after a 2-and-a-half-year stint at the defendant employer. Instead, Rosenberg relies on a series of rosy assumptions – as to job longevity, promotions, bonuses, investment decisions, and stock market returns, among other things – to construct a hypothetical future in which plaintiff retires from KPMG in 2053 as a handsomely-paid Manager, Senior Manager, or Managing Director, with at least $1.8 million (Scenario 1B) and as much as $6.7 million (Scenario 3A) in his tax-deferred

---

[13] Even in these cases, the front pay award is typically calculated based on the salary that the employee earned or would have earned in his old position – not what he would have made had he been promoted one, two, or three ranks *above* that position and/or received discretionary bonuses. *See, e.g.*, *Padilla*, 92 F.3d at 126 (awarding "the difference between [plaintiff's] salary as a train dispatcher and the salary paid to the superintendent of train operations"); *Bethlehem Steel*, 958 F.2d at 1189 (noting that plaintiff's damages expert assumed that plaintiff would receive raises of approximately 8.3% per year for the next 17 years, consistent with his actual salary history for the past 17 years at the same employer). In *Buckley*, 690 F. Supp. at 217-18, the court used plaintiff's last full-year salary at Reynolds as the "benchmark," but ultimately declined to award any front pay based on salary differentials, because the gap between that benchmark and plaintiff's post-termination salary at a different company was only $2600 per year, which was insufficient, "[w]hen considered in light of the manifold uncertainties and estimates employed in arriving at the figure," to "form the basis for an award of front pay." *Id*. at 218.

KPMG 401(k) account. *See* Rosenberg Rep. at 17-18 (Scheds. 5-7). Because those assumptions are speculative, unrealistic, and ungrounded in the record, Rosenberg's reliance on them renders his analysis unreliable at multiple steps, requiring that his testimony be excluded.

Rosenberg begins by assuming not only that plaintiff will work to age 65 and a half,[14] but also that (had he not been terminated in 2020) he would have worked *at KPMG* to age 65 and a half, spending the remaining 33 years of his professional career at the same firm. *See* Rosenberg Rep. at 6, 12-15 (Scheds. 2-4). At deposition, Rosenberg could not point to any evidentiary support for this crucial assumption, *see* Rosenberg Dep. at 20:9-11, and it is dramatically at odds with plaintiff's actual employment history, during which he has moved from firm to firm frequently, staying with each employer for an average of less than two years. Moreover, while an expert forecasting lost future earnings may properly "consider the length of time employees in similar positions stay at the defendant employer as well as at other employers," *Peyton*, 287 F.3d at 1129, Rosenberg did not do that. *See* Rosenberg Dep. 26:7-21, 28:7-24. Defendant, on the other hand, submits data showing that the median tenure at a single employer for individuals engaged in "[b]usiness and financial occupations," according to the U.S. Department of Labor, was 4.7 years in January 2020 and 4.3 years in January 2022. *See* Hughes Decl. Ex. F (Dkt. 70-7), available at https://www.bls.gov/news.release/tenure.t06.htm (last visited March 21, 2024). I therefore conclude that Rosenberg's 33-year projection is speculative, conjectural, and relies upon "unrealistic assumptions." *Boucher*, 73 F.3d at 21; *see also Chisholm v. Mem'l Sloan-Kettering*

---

[14] Standing alone, the assumption that a healthy 32-year-old male with a master's degree will work to age 65 and a half is not unduly speculative, because it is supported by statistical WLE data published by the federal government and routinely relied upon to project future earnings and for related purposes. *See, e.g.*, *Dershowitz v. United States*, 2015 WL 1573321, at *21 (S.D.N.Y. Apr. 8, 2015) (issuing wrongful death award based in part on decedent's "statistical work-life expectancy").

*Cancer Ctr.*, 824 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (rejecting "Chisolm's proposed method for calculating lost pension benefits," which was based on "assumed employment through 2020," as "unduly speculative").[15]

Rosenberg's assumptions as to plaintiff's hypothetical promotions and bonuses at KPMG are equally speculative. During his short tenure at the firm, plaintiff received no promotions and a single bonus of $5000 (3.33% of his salary) at the end of FY 2019. Rosenberg Rep. at 10 n.6. Moreover, Rosenberg has no expertise regarding promotion or bonus practices at KPMG, *see* Rosenberg Dep. at 49:12-15 (testifying that he was just "doing hypotheticals," not offering any expert opinion as to the assumed promotions), and plaintiff apparently did not retain a vocational expert qualified to offer such an opinion. *Cf. Joffe v. King & Spaulding*, 2019 WL 4673554, at *7 (S.D.N.Y. Sept. 24, 2019) (excluding proposed expert testimony by legal recruiter as to plaintiff's "chances of becoming counsel or partner at K&S," because expert had no firm-specific knowledge of K&S's promotion practices). There is thus no basis in the record for the "main assumption in all 3 scenarios," Rosenberg Rep. at 10 n.6, namely, that plaintiff would have been promoted to Manager at the end of FY 2020 – much less for Rosenberg's further assumptions, in Scenarios 2 and 3, that plaintiff would have been promoted to Senior Manager and then Managing Director.

---

[15] In *Chisolm*, the plaintiff faced another hurdle, namely, that even before his unlawful termination he had a "poor working relationship" with his managers, complained frequently, and engaged in "troubling" conduct that made it likely that he would have been "terminated for lawful reasons," or resigned, "well before he attained retirement age." 824 F. Supp. 2d at 579. Plaintiff Pogil's remaining tenure at KPMG (had he not been terminated in the 2020 RIF) could also have been rocky. In the first half of FY 2020 his utilization was low; in February, he embarrassed Lin and angered Masaitis by accepting and then turning down the (local) BTS assignment; and in May, in response to his LPM, he called Ziegler a liar. LPM at 1, 4. Additionally, it appears that Pogil surreptitiously audio-recorded his May 12 phone call with Masaitis, in violation of KPMG policy, *see* Review Tr., and then denied having done so. *See* Inves. Rep. at 18. Any or all of these incidents could well have shortened his tenure at KMPG even if he survived the RIF.

The same is true with respect Rosenberg's "conservative" assumption that "annual bonuses are kept at 10% of base salary in all three scenarios." Rosenberg Rep. at 10. There is nothing "conservative" about assuming that plaintiff would receive an annual bonus, for decades, at triple the rate of the single bonus he actually earned at KPMG. Nor is there any other evidence in the record supporting Rosenberg's bonus projection.

Even where a plaintiff has a more robust history of promotions and bonuses, the courts are reluctant to accept assumptions about hypothetical promotions and bonuses for purposes of calculating damages. *See, e.g.*, *Chisholm*, 824 F. Supp. 2d at 578 (refusing to include projected merit raises in front pay calculation because there was "no basis in the record to conclude that Chisholm would have continued to receive annual raises, especially not consistently at the relatively high rate of four percent, beyond 2007"); *Buckley*, 690 F. Supp. at 218-19 (calculating 60-year-old plaintiff's lost pension benefits based on an assumption that he would have remained at Reynolds until retirement, but "assuming no salary increases," even though plaintiff had received multiple raises during the 25 years he worked for Reynolds); *Bonura*, 629 F. Supp. at 361 (declining to engage in "rear view fortunetelling" by including "likely bonuses" in back pay calculation, where bonuses at Chase were discretionary and in the past "plaintiffs did not receive a bonus in each year of their employment"). Here, given plaintiff's record of zero promotions and a single, modest bonus at KPMG, I conclude that Rosenberg's promotion and bonus assumptions – like his assumption about the length of plaintiff's hypothetical KPMG career – are too speculative, conjectural, and unrealistic to support his opinions.

Rosenberg's remaining assumptions are equally ungrounded in the record. He notes that KPMG's 401(k) CAP plan is new (rolled out in 2022) and "very generous," Rosenberg Rep. at 3, making it very expensive for the employer, but does not explain why he believes that the same

plan will remain in place for the next 33 years. In *Buonanno v. AT&T Broadband, LLC*, 313 F. Supp. 2d 1069, 1085-86 (D. Colo. 2004), the court rejected a front pay calculation based in part on hypothetical future 401(k) contributions because it was "speculative" for plaintiff's expert to assume "that AT&T would have continued to provide the same level of matching contributions for the next 15 years." The same flaw renders the Rosenberg Report unreliable.

Finally, the Rosenberg Report discloses no basis for the assumption that plaintiff would have invested his hypothetical 401(k) account at an aggressive 80/20 (equities/fixed income) ratio. Plaintiff has never had an actual 401(k) account, *see* Rosenberg Rep. at 3, 7, and there is no non-hearsay evidence in the record demonstrating that he has an investment track record of any sort. *Cf.* Rosenberg Dep. at 18:7 ("Boris told me that he tends to invest aggressively.") It is thus difficult to avoid the suspicion that the investment strategies reflected in the Rosenberg Report were selected with an eye towards maximizing the results.

Any one of these "unrealistic assumptions," *Boucher*, 73 F.3d at 21, would render Rosenberg's opinions "unduly speculative." *Chisholm*, 824 F. Supp. 2d at 579. Taken together, they make it impossible for the Court to conclude that the Rosenberg Report "rests on a reliable foundation," as required by *Daubert*, 509 U.S. at 597. Consequently, it must be excluded.

### 3.     Multiplying Damages

Assumptions aside, the Rosenberg Report suffers from an additional analytical flaw which, if accepted by the finder of fact, would result in a duplicative damages, furnishing additional grounds for exclusion. *See Phoenix Light SF Ltd. v. Bank of New York Mellon*, (VEC), 2020 WL 2765044, at *3 (S.D.N.Y. May 28, 2020) (excluding expert damages report due to double-counting).

"Front pay involves calculating economic losses that will be experienced by a plaintiff in the future, as a result of the unlawful conduct of the defendant." *Angulo v. 36th St. Hosp. LLC*, 2020 WL 4938188, at *11 (S.D.N.Y. July 31, 2020), *report and recommendation adopted*, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020). Unlike back pay – which is awarded in arrears – front pay is awarded in advance, and therefore must be discounted to present value. *See, e.g.*, *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 485 (S.D.N.Y. 2001) (front pay awards must be reduced to present value because "a dollar in hand today is worth more than a dollar to be paid a year from today") (quoting *McCrann v. U.S. Lines, Inc.*, 803 F.2d 771, 772 (2d Cir. 1986)). "This basic principle of finance is employed by courts daily in calculating appropriate damage awards, to ensure that parties receive neither an undeserved windfall nor an unfair penalty." *McCrann,* 803 F.2d at 772.

Rosenberg recognizes that any front pay award, including an award based on future 401(k) contributions, must be reduced to present value. *See* Rosenberg Rep. at 8.[16] He errs, however, by projecting 33 years of hypothetical future stock market returns on those 401(k) contributions (using a Monte-Carlo simulation), and adding the returns to the total proposed award, before performing any present-value calculation. As defendant correctly points out, this would effectively provide

---

[16] Rosenberg states that he performed his present-value calculations using a "bond ladder" composed of U.S. Treasury securities with maturities ranging up to 30 years, *see* Rosenberg Rep. at 16 n.8, but he does not provide the specific discount rates used. Nor does he address whether – and if so how – he accounted for the fact that, in the ordinary course, "funds placed into a 401(k) benefit from favorable tax-deferred treatment on the condition that the money cannot be distributed before the accountholder reaches retirement age without, generally speaking, incurring an early-withdrawal penalty." *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1260 (N.D. Ill. 2015), *aff'd*, 842 F.3d 1010 (7th Cir. 2016). When future 401(k) contributions are awarded well before retirement age, as part of a front pay award, the plaintiff gets "something of a windfall by avoiding that tax hit," which should be incorporated into the present-value calculation. *Id*. at 1261.

plaintiff with a "double recovery," Def. Mem. at 18, because he will be able to "invest [the award] all over again." *Id*.

Once a front pay award is made, the plaintiff is free to dispose of the funds as he sees fit, including by investing them in the stock market. If he is a particularly wise (or lucky) investor, he may end up earning more, over the front pay period, than the discount rate used in the present-value calculation. But he is not entitled to receive the present value of future hypothetical stock market returns *and* earn *actual* stock market returns, over the same period of time, on the same dollars. Not surprisingly, therefore, plaintiff does not cite, and the Court has not identified, any cases including future hypothetical investment earnings in a front pay calculation – even where, as here, the award includes future 401(k) contributions. *See, e.g.*, *Hurley v. Kent of Naples, Inc.*, 2012 WL 12903849, at *3 (M.D. Fla. Sept. 17, 2012); *Soliday v. 7-Eleven, Inc.*, 2011 WL 4949652, at *3 (M.D. Fla. Oct. 17, 2011); *Branham v. Snow*, 2006 WL 3230310, at *12-13 (S.D. Ind. June 19, 2006); *King v. Hawkeye Cmty. Coll.*, 2000 WL 133955, at *5-6 (N.D. Iowa Jan. 3, 2000); *Reginelli v. Motion Indus., Inc.*, 987 F. Supp. 1137, 1141 (E.D. Ark. 1997). Consequently, even if the assumptions underlying this aspect of Rosenberg's report were reasonable, the portion of his analysis devoted to projecting (and then present-valuing) 33 years of stock market gains in plaintiff's hypothetical 401(k) account would not be admissible.

## III.    CONCLUSION

For the foregoing reasons, defendant's motion to exclude the Rosenberg Report is GRANTED. The Clerk of Court is respectfully instructed to close the motion at Dkt. 70.

Dated: New York, New York                          **SO ORDERED.**
       March 21, 2024

**BARBARA MOSES**
**United States Magistrate Judge**

29